MR. CHIEF JUSTICE HASWELL
delivered the opinion *524 of the Court.
Defendant appeals from his conviction of criminal possession of dangerous drugs with intent to sell in violation of section 45-9-103, MCA. We reverse.
The facts of this case are uncontroverted. Robert and Mae Westfall were the managers of Shurgard Mini Storage in Billings, Montana, a collection of storage units which are rented out to customers. In January 1981, the Westfalls rented a unit to defendant who identified himself as “Bill Hayes.”
On July 31, 1981, at closing time, defendant arrived at Shurgard and was given permission to go to his unit. Because Mae Westfall had earlier instructed another customer (Bender) to lock the gate when he left, Mae Westfall went to inform Bender of defendant’s presence. After doing so, she noticed the door to defendant’s unit was shut and wondered what he was doing, since there were no interior lights in defendant’s unit. Mrs. Westfall also wanted to know how much longer defendant was going to be on the premises.
Mrs. Westfall walked to the door of defendant’s unit, knocked and said, “Hey, you in there.” There was no response so she repeated the procedure with no result. She then opened the door and saw defendant sitting on the floor, pointing a gun at her. She also saw two suitcases on the floor behind him but was unable to describe them because of the dimness of the room’s interior. She then yelled for Bender, who tried to wrestle the gun from defendant. Mrs. Westfall left to inform her husband who in turn called the police. The police arrived after defendant had left but the Westfalls informed them that they did not wish to press any charges at that time.
Pursuant to company policy, Mrs. Westfall called the Washington home office on the next working day and related the events to them. Personnel at the home office suggested the Westfalls find out what was in the suitcase. Mr. Westfall removed the hinge pins from the padlocked door and entered defendant’s unit. He opened one of the suit *525 cases and saw a number of bottles of pills. He also opened a purse lying on the floor which he found to contain silverware. After closing the suitcase, purse and replacing the door, Mr. Westfall called the police indicating that they now wished to press assault charges.
Based on the information provided by the Westfalls, the Billings police obtained a search warrant and seized the suitcase and purse. The contents of the suitcases and purse were inventoried, revealing well over 100 bottles of pills and on August 8, 1981, defendant was charged with criminal possession of dangerous drugs with intent to sell. Defendant pleaded not guilty and filed a motion to suppress. The court denied the motion and, after a nonjury trial, sentenced the defendant to fifteen years in the Montana State Prison and designated him a dangerous offender. Defendant appeals.
Defendant raises two issues on appeal which can be stated as follows:
1. Whether the District Court erred in failing to suppress the evidence.
2. Whether the District Court erred in adopting the State’s proposed findings of fact and conclusions of law.
With regard to the first issue appellant argues that Montana’s position on “citizen searches” mandates a reversal, citing State v. Hyem (1981), Mont., 630 P.2d 202, 38 St.Rep. 891; State v. Helfrich (1979), Mont., 600 P.2d 816, 36 St.Rep. 1763; State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442; and State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47. These cases all stand for the proposition that evidence obtained by a private citizen in violation of another’s constitutional rights is subject to the exclusionary rule and may not be admitted into evidence in a criminal trial in this state. The fact that Montana’s constitution explicitly guarantees an individual’s right to privacy was a major factor of the Hyem and Helfrich decisions:
“The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest. 1972 Montana *526 Constitution, Article II, Section 10.”
The State concedes that, if we follow Hyem and its predecessors, the defendant’s conviction must be reversed but argues that we should reverse those cases and allow evidence illegally obtained by private citizens to be admitted in a criminal trial. The State further agrees that the exclusionary rule deterrence rationale (to deter police from violating other’s constitutional rights by excluding the evidence) has no application to private citizens because they do not realize the evidence is suppressible.
We decline to overrule our previous citizen search cases and reaffirm our position taken therein. We base our reasoning on the firm stance taken by the Montana Constitution guaranteeing an individual’s right of privacy. Our holding today is also rooted in the concept of judicial integrity, i.e., the judicial system must not become an accomplice to constitutional violations by admitting evidence illegally obtained.
It is clear from the seminal cases involving the exclusionary rule that judicial integrity was one of the main reasons for the exclusion of illegally obtained evidence. In Weeks v. United States (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, the issue was whether evidence obtained unconstitutionally by government agents should have been admitted at trial. The Court found that it should not have been admitted and stated the following:
“To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action.”, 232 U.S. at 394, 34 S.Ct. at 345, 58 L.Ed. at 656.
Later in Elkins v. United States (1960), 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, the court outlawed the “silver platter doctrine” whereby evidence illegally obtained by state officers would be turned over to federal prosecutors in federal criminal trials. In so doing, the Court stated:
“But there is another consideration — the imperative of ju *527 dicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandéis so eloquently spoke in Olmstead v. United States, 277 U.S. 438, at 469, 471 [48 S.Ct. 564, at 569, 570, 72 L.Ed. 944], more than 30 years ago. ‘For those who agree with me,’ said Mr. Justice Holmes, ‘no distinction can be taken between the Government as prosecutor and the Government as judge.’ 277 U.S. at 470 [48 S.Ct. at 575]. (Dissenting opinion.) ‘In a government of laws,’ said Mr. Justice Brandéis, ‘existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; invites anarchy. To declare that in the administration of the criminal law the end justifies the means — to declare that the Government may commit crimes in order to secure the conviction of a private criminal — would be terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.” 277 U.S. at 485 [48 S.Ct. at 575]. (Dissenting opinion.) 364 U.S. at 222, 223, 80 S.Ct. at 1447, 4 L.Ed.2d at 1680 — 81.
We said in Coburn, supra, in commenting on the above quote:
“[Unreasonable or illegal intrusions knowingly accepted and used, from the private sector by the government amount to an extension of the silver platter doctrine condemned by Elkins, particularly, when viewed in the light of judicial integrity emphasized in Elkins.” (Emphasis in original.) 165 Mont, at 503, 530 P.2d at 450.
The next landmark case in the development of the exclusionary rule was Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, which made the exclusionary rule binding in both state and federal cases. The concept of the judiciary remaining free from the taint of illegally seized evidence played a large part in the decision as revealed by the Court’s concluding statement:
*528 “Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, the judicial integrity so necessary in the true administration of justice.” 367 U.S. at 660, 81 S.Ct. at 1694, 6 L.Ed.2d at 1093^
See Terry v. Ohio (1968), 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, 901 (“A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur”).
McCormick on Evidence has this to say in the concluding paragraph in the section on evidence obtained by private individuals:
“On balance, the factors seem to favor the imposition of the exclusionary rule. Although the situation is distinguishable from that in Mapp, the distinction is not of sufficient breadth to justify a drastic difference in the treatment of the resulting evidence. While the need to protect personal security from private as well as public invasion is certainly an important factor, the controlling matter is the unfairness of the use of the evidence and the degrading of the judicial system that must necessarily accompany that use.” (Emphasis added.) McCormick on Evidence §168, at 374.
Here there were two methods used in unlawfully gaining access to defendant’s rental unit. Mr. Westfall removed the hinge pins on the door for the first entry and cut defendant’s padlock off the door for the second. It is hard to imagine more blatant violations.
It is uncontroverted here that the Westfalls had no idea that they would find any drugs in the suitcases. When Mrs. Westfall first knocked on and opened the door, the light was so dim that she could not describe the suitcases behind the defendant. Defendant’s unit had no interior light and *529 no windows and one needed to crawl in or out to enter or exit it. We note that defendant has already been convicted and sentenced on the assault charge for pointing the gun at Mrs. Westfall.
To sanction the admission of the evidence gained in this unlawful manner by allowing its presentation in a criminal trial makes the courts of this state a party to violations of the constitutional rights of the defendant and runs afoul of any viable notion of judicial integrity as outlined in Coburn, supra.
It is also undisputed in the case at bar that the defendant’s right to privacy was violated. Defendant is guaranteed this right under Art. II, §10 of our state constitution, supra. Of the ten states expressly protecting privacy in their constitutions, only two (Alaska and Montana) have privacy guarantees that stand alone in a separate section of the state constitution, A Right of Privacy as a Matter of State Constitutional Law (1977), 5 Fla.St.L.Rev. 631, 690-701. Although the Alaska courts apparently have interpreted their constitution to require state action to trigger the exclusionary rule, Allred v. State (Alaska (1976), 554 P.2d 411, 416, we believe the better approach is that followed in Brecht and its progeny, supra. Montana’s privacy right is the most elegant and the most uncompromising of the various privacy statements. 5 Fla.St.L.Rev. at 738.
Respondent contends that we should adopt the good faith approach to the exclusionary rule approved by the Fifth Circuit in United States v. Williams (5th Cir. 1980), 622 F.2d 830. We are not persuaded by this argument. As discussed above, Montana’s constitutional guarantee of privacy is expressed in the strongest terms of any state constitution in the country and we are not bound by federal interpretations from other circuits.
Statistics show that most motions to suppress are concentrated in offenses involving narcotics, weapons and gambling (with one-half filed in crimes involving narcotics and weapons), persuasive evidence that the application of the *530 exclusionary rule is concentrated in these few areas, Studying the Exclusionary Rule in Search and Seizure (1970), 37 Univ. of Chicago L.Rev. 665, 706.
These circumstances usually arouse little if any public support or sympathy for the defendant whose rights are violated. However, in a different context, the question of the admission of illegally obtained evidence is less volatile. For example, say an employee of a bank breaks into another’s safety deposit box and discovers a stolen watch, a clear constitutional violation. Are the rights of pusher or murderer any less than the watch thief’s simply because our society today views the latter crime as innocuous and less heinous? Our Constitution was not grounded on such shifting sand.
To admit at a criminal trial evidence illegally obtained by private citizens is to encourage a vigilante movement which has no redeeming social value in our society today. Moreover, many prosecutors in this state would refuse to base a charge or information on such evidence but there are some who persist in doing so.
The State argues that by not allowing the fruits of an unlawful citizen’s search into evidence, many would-be criminals are allowed to go free. However, two recent studies indicate that the exclusionary rule has a negligible effect in freeing defendants. One study surveyed nearly 3,000 cases in 38 United States Attorney’s offices between July 1 and August 31, 1978. Only 1.3 percent had evidence suppressed because of Fourth Amendment violations and more than half of the defendants who successfully moved to suppress were convicted anyway, Comptroller General of the United States, The Impact of the Exclusionary Rule in Federal Criminal Prosecutions, rep. no. 66D-79-45 (April 19, 1979). Another study found that less than one percent of all arrests were eliminated for no follow-up prosecution because of due process violations such as illegal searches and seizures, Frost Lucianovich & Cox, What Happens After Arrest? (Wash.D.C.Art. for Law and Social Research, August 1977).
*531 National figures show that only 2 percent of the total number of persons held for prosecution were charged with weapons or narcotics offenses, the crimes where the exclusionary rule is applied most often, 37 Univ. of Chicago, L.Rev. at 681. In view of these facts, the State’s argument that many criminals are set free because of suppression of illegally-seized evidence due to the exclusionary rule loses much of its force. Also, statistics covering twelve years of law enforcement activity in Cincinnati, Ohio, show that the adoption of the exclusionary rule had no apparent effect on arrests or convictions in narcotics, weapons and gambling offenses, 37 Univ. of Chicago L.Rev. at 707.
Appellant argues that no probable cause existed to support the issuance of the search warrant in this case and it follows from what we have said above that we agree. The warrant was based on evidence illegally obtained by Mr. Westfall and the warrant was tainted thereby. See United States v. Crews (1980), 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537.
Appellant’s second issue relates to whether the District court erred in adopting the State’s proposed findings of fact and conclusions of law. Appellant argues that this action violates the rule of law set forth in Tomaskie v. Tomaskie (1981), Mont., 625 P.2d 536, 38 St.Rep. 416. The State concedes its proposed findings and conclusions were accepted by the District Court with only minor changes.
We note that subsequent to the Tomaskie case, this Court decided Jensen v. Jensen (1981), Mont., 631 P.2d 700, 38 St. Rep. 1109, wherein we stated that such an adoption is not grounds for reversal if the findings and conclusions are sufficiently comprehensive and supported by the evidence. It is clear from what was said above that the District Court’s decision is not supported by the evidence or the law and thus fails to comport with this standard.
Reversed.
MR. JUSTICE SHEA concurs.
*532 MR. JUSTICE DALY, who was unable to attend the oral argument, did not participate in this decision.