No. 84-280

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

STATE OF MONTANA,

        Plaintiff and Appellant,

-vs-

CHARLES LONG and VICKI LONG,

        Defendants and Respondents.

_____

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Mike Greely argued, Attorney General, Helena, Montana
        Harold F. Hanser argued, Billings, Montana

    For Respondents:

        Joseph P. Hennessey argued, Billings, Montana

_____

Submitted: January 21, 1985

Decided: May 3, 1985

Filed: MAY - 3 1985

*Ethel M. Harrison*

Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

The State of Montana appeals an order of the Honorable Diane Barz, Judge of the Thirteenth Judicial District, Yellowstone County, granting defendant's motion to suppress. We reverse and remand.

Defendants, Charles and Vicki Long, at the time of the charged offense, were renters of a house in Huntley, Montana. The owner of the house, Millard Hultgren, lived next door. There was no written rental agreement between the parties. The landlord believed he had a right to enter his rental property at will. However, conflicting testimony was presented on whether the tenants ever consented to such an arrangement. The tenant Charles Long testified that there was no such agreement.

A sudden increase in the electricity bill for the rental house, a landlord obligation under the oral tenancy, caused concern. In the evenings, Hultgren noticed a light burning in the attic. On August 4, 1983, he entered, when the defendants were not home, and went to the attic where he discovered a "grow light" shining on what was later determined to be 657 marijuana plants. Hultgren's status at this point was a fact question. The District Court's finding that he was a trespasser is supported in the record.

The Yellowstone County Sheriff's Office was notified and an application made for a search warrant. Subsequently, the warrant was issued and the marijuana plants seized.

The defendants were charged and subsequently filed a motion to suppress. This case presents four-square the issue previously addressed on several occasions, the application of the privacy clause and the exclusionary rule to private action. The narrow issue before the Court in this case is:

> "Are the fruits of a search conducted by a private citizen, without any type of governmental involvement, properly the subject of exclusion?"

This Court has previously held that private searches invade privacy rights protected by the Constitution and are properly the subject of our exclusionary rule. The rule was first articulated in State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47. The same principle has been refined, approved or commented upon in the following cases: State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442; State v. Sawyer (1977), 174 Mont. 512, 571 P.2d 1131; State v. Helfrich (1979), 183 Mont. 484, 600 P.2d 816; State v. Hyem (Mont. 1981), 630 P.2d 202, 38 St.Rep. 891; State v. Sayers (Mont. 1982), 648 P.2d 291, 39 St.Rep. 1309; State v. Van Haele (Mont. 1982), 649 P.2d 1311, 39 St.Rep. 1586. The rule has also been referred to in headnotes in State v. Sykes (Mont. 1983), 663 P.2d 691, 40 St.Rep. 690, and Duran v. Buttrey Food, Inc. (Mont. 1980), 616 P.2d 327, 37 St.Rep. 1545.

The last two cases to thoroughly analyze the rationale for the position applying the exclusionary rule to evidence seized by private persons are State v. Hyem, supra, and State v. Van Haele, supra. In Hyem, the charges arose when skis, belonging to one Buzz Welch, were found in defendants' residence and seized by officers of the Carbon County Sheriff's Office pursuant to a search warrant issued by the local justice of the peace. The issuance of the warrant was based on affidavits given by two of Welch's friends, who stated they had seen the skis at defendants' rented home in Red Lodge, Montana. The informants had gained entry into defendants' rented residence by telling a local realtor that they were interested in purchasing the home, although in point of fact, they were interested in looking for the skis. Therefore, the informants were technically trespassers.

The majority opinion distinguished the right of privacy in Montana from the right of privacy protected by the Federal Constitution and noted that the right of privacy was specifi-

3

cally guaranteed in Article II, Section 10 of the 1972 Montana Constitution. The majority said:

> "In Brecht, it was pointed out that there cannot be a fictional difference between classes of citizens: those who are commanded to obey the constitution and those who are not. Our constitutional prohibition against unreasonable invasion of privacy applies to all persons, whether acting for the state or privately." Hyem, 630 P.2d at 206, 38 St.Rep. at 894.

This Court, in Hyem, indicated a concern with "the ever-increasing presence of private police" and relied upon this concern in shoring up the argument that the privacy provision of the Constitution should be applied to prohibit individual action as well as state action.

Next, the majority opinion in Hyem addressed the application of the exclusionary rule to evidence seized illegally by private individuals. Unlike other courts, which have viewed the exclusionary rule as a rule of procedure, this Court indicated that the exclusionary rule was rooted in the Constitution itself. The majority said:

> "The exclusionary rule is not a judicial plaything, casually adopted and casually waived. It is a constitutional answer to unconstitutional activity. It is an affirmation that a free government can no more tolerate the unlawful activities of its agents than crime in the streets. It is paste and cover for the bones of our individual constitutional rights, without which such rights were in danger of becoming an unfleshed skeleton." Hyem, 630 P.2d at 208, 38 St.Rep. at 897.

The majority noted that a distinction had to be made where the unreasonable search was made by private individuals and not by the police. The Court's opinion, in essence, distinguished federal law denying the application of the exclusionary rule to the fruits of private action by arguing that the Federal Constitution was not violated by private action and that, therefore, the exclusionary rule was not applied. However, this Court noted that, since our State Constitution was violated by a private search, the exclusionary rule should appropriately be applied in order to protect from having the constitutional right invaded. This

4

rationale logically follows if the exclusionary rule itself is implied in the Constitution in order to give meaning to those constitutional rights specifically provided.

The dissent in State v. Hyem, supra, was premised upon traditional notions of constitutional principles. Unless specifically provided otherwise, citizens' rights articulated in the Constitution proscribed only state action; therefore, if a private citizen invaded the privacy of another citizen, there was no violation of the Constitution itself. Furthermore, in accordance with the view of all other courts, the dissent viewed the exclusionary rule as a rule of court procedure to deny admission to the fruits of illegally seized evidence in order to deter unlawful police activities and to preserve the integrity of the judiciary itself.

This Court now adopts the rationale of the three dissenters expressed in State v. Hyem, supra, and overrules all previous decisions of this Court inconsistent herewith.

Montana is one of a small minority of states to have an express provision for privacy in its Constitution. No other state has followed Montana's lead in interpreting the privacy protections of a state constitution to be applicable to acts of private persons. Other state courts have commented upon the Montana decisions. In fact, a District Court judge in Wyoming was persuaded to follow this jurisdiction. On appeal, the Wyoming Supreme Court said:

> "The sole jurisdiction which we have been able to identify in which a different rule prevails is in our sister state of Montana. The rule in Montana appears to be that the same constitutional protections pertain whether a search and seizure involves private individuals or law enforcement officers. State v. Hyem, Mont., 630 P.2d 202 (1981). The most charitable rationalization of that ruling is that it depends upon a peculiar provision of the Constitution of the State of Montana which is not found in the constitution of this state. Even so, the dissenter to the court's opinion in State v. Hyem, supra, points out that other states having the same style of constitutional provision have adhered to the usual rule distinguishing private individuals from law enforcement officers. On the other hand one well could conclude, having perused the somewhat tortured history of that rule in the

State of Montana, that the rule is chimerical. Unfortunately in this instance Deon Heiner persuaded the district judge to follow that rule in essence." State v. Heiner (Wyo. 1984), 683 P.2d 629, 636.

We do not take offense at the Supreme Court of Wyoming terming our rule chimerical, which means fantastic or imaginary. Neither are we afraid to walk alone. Rather, we reverse the previously articulated rule because we believe it unsound.

The privacy section, Mont. Const. Art. II, § 10 (1972), specifically states:

"The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." (emphasis supplied)

The language of the section itself indicates that the framer's contemplated state action by allowing an invasion where there was a compelling state interest.

Historically, constitutions have been means for people to address their government. In rare instances, the constitutional language itself has specifically addressed private action. For instance, Mont. Const. Art. II, § 4 (1972), provides in part:

". . . Neither the state nor any person, firm, corporation, or institution shall discriminate against any person . . . ." (emphasis supplied)

Notably, the privacy section does not address private individuals as does the civil rights provision quoted.

Although we do not feel our Constitution is sufficiently ambiguous to require extensive perusal of the constitutional transcripts, we do note that a speech on the floor of the convention by one delegate has been referred to in other decisions of this Court. In State v. Helfrich, supra, this Court eluded to the following excerpt from the constitutional debate:

"'. . . It isn't only a careless government that has this power to pry; political organizations, private information gathering firms, and even an individual can now snoop more easily and more effectively than ever before . . . ' Tr. at p.

6

5182." Helfrich, 183 Mont. at 488, 600 P.2d at 818.

This quotation actually resulted from a delegate reading from a newspaper editorial which supported an expanded right of privacy. However, the balance of the delegate's statement is significant. It reads:

> "[I]t produces what I would call a semipermeable wall of separation between individual and state; just as the wall of separation between church and state is absolute, the wall of separation we are proposing with this section would be semipermeable. That is, as a participating member of society, we all recognize that the state must come into our private lives at some point; but what it says is, don't come into our private lives unless you have a good reason for being there. We feel that this, as a mandate to our government, would cause a complete reexamination and guarantee our individual citizens of Montana this very important right . . . ." (emphasis supplied) Montana Constitutional Convention, Transcript of Proceedings, Vol. VII, pp. 5185-5182.

There is every indication that the delegates themselves adopted a privacy section which would only proscribe state action. Certainly, there is nothing in the constitutional debate that clearly indicates we should depart from traditional constitutional notions. Therefore, in accordance with well-established constitutional principles, we hold that the privacy section of the Montana Constitution contemplates privacy invasion by state action only.

The second issue which must be addressed is application of the exclusionary rule. Since we have held that the constitutional rights of the defendants have not been violated, the reason for applying the exclusionary rule fades. As a rule of court procedure, the exclusionary rule has been applied to deter illegal police conduct and to preserve judicial integrity. When applied to private action, the deterrence argument is inapplicable. Private individuals are not schooled in the exclusionary rule and most likely would be unaware of its application. Therefore, it would not deter them from engaging in searches that would be illegal if conducted by government officials.

The strongest support for application of the exclusionary rule to the fruits of private action comes from the "silver platter doctrine." In a special concurrence filed to the majority opinion in State v. Van Haele, supra, reference was made to that doctrine:

> ". . . As pointed out in the majority opinion, the United States Supreme Court in Elkins said in part:

> "'If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.' (Citations omitted.) 364 U.S. at 223, 80 S.Ct. at 1447, 4 L.Ed.2d at 1681.

> "In Coburn, also cited by majority, Justice Daly very logically noted:

> "'. . .[U]nreasonable or illegal intrusions knowingly accepted and used, from the private sector by the government amount to an extension of the silver platter doctrine condemned by Elkins, particularly when viewed in the light of judicial integrity emphasized in Elkins.' (Emphasis in original) 165 Mont. at 503, 530 P.2d at 450."

The special concurrence went on to note that:

> "If the 'silver platter doctrine' is to be recognized for the purpose of excluding evidence obtained by private individuals then, in my opinion, it should be confined to instances where the evidence was obtained in violation of criminal statutes thereby rendering the evidence 'illegal.' In this way judicial integrity is preserved by not judicially blessing the fruits of illegal activity. Such an application of the exclusionary rule would not be premised upon an invasion of the accused's constitutional rights. Rather, the exclusionary rule, as a rule of court procedure, would prevent the State from relying upon the illegal conduct of a private citizen." Van Haele, 649 P.2d at 1318, 39 St.Rep. at 1595-1596.

In the case at bar, the evidence was seized by a landlord who was determined by the District Court to be a trespasser. Under such circumstances, judicial integrity does not require exclusion of the evidence. We reserve for another day the determination of whether to apply the exclusionary rule to evidence gathered as the result of felonious conduct.

The order of the District Court suppressing the
questioned evidence is reversed. The case is remanded for
trial.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

Justices

Mr. Justice Fred J. Weber concurs as follows:

As pointed out in the majority opinion, starting in 1971 this Court articulated the rule that private searches invade privacy rights protected by Art. II, Sec. 10, Mont.Const. and are therefore properly subject to the exclusionary rule. That rule was set forth in numerous cases, the last of which was decided in 1983. In view of our reversal of that well-established holding I think it appropriate to discuss the rule of stare decisis.

We recognize that a significant change in a basic rule of law unsettles the law and gives rise to criticism. State ex rel. Sparling v. Hitzman (1935), 99 Mont. 521, 525, 44 P.2d 747, 749, describes the problems in failing to follow established precedent, as well as the need for evolution of the law:

> "We realize the force and the wisdom of the rule of stare decisis. We are not unmindful of the fact that principles of law should be positively and definitively settled in order that courts, lawyers, and, above all, citizens may have some assurance that important legal principles involving their highest interests shall not be changed from day to day, with the resultant disorders that of necessity must accrue from such changes. We are mindful, however, of the fact, as stated by Mr. Justice Brandeis . . . that 'in the search for truth through the slow progress of inclusion and exclusion, involving trial and error, it behooves us to reject, as guides, the decisions upon such questions which prove to have been mistaken.' The rule of stare decisis will not prevail where it is demonstrably made to appear that the construction placed upon the constitutional provision in the former decision is manifestly wrong." (emphasis supplied)

Principles of law should be definitively settled if that is possible. However, as suggested by Justice Brandeis, the search for truth involves a slow progress of inclusion and exclusion, involving both trial and error. I do not cast any

10

reflection on those justices who participated in the opinions which are being overruled.  However, I do believe that the decisions were fundamentally mistaken.  I concur with the majority conclusion that Art. II, Sec. 10, Mont.Const. contemplated state action and did not address the question of private action.

I concur with the majority opinion.

Justice _____

Mr. Justice John C. Sheehy, dissenting:


Today's opinion has derailed the one vehicle that gave strength and vitality to the unique right of privacy enshrined in our State Constitution. Our state right of privacy had meaning and force in our lives because this Court excluded evidence obtained in violation of privacy. Until today it was the proud accomplishment of this Court, in the several cases today overruled, that enhanced by judicial decision what the framers proclaimed, that "the right of individual privacy is essential to the well being of a free society, and shall not be infringed without the showing of a compelling state interest." Today the vigor of that ringing proclamation has been drained, leaving it merely a hortative form of words.

The devastation is complete. The immediate effect of today's opinion is to advise tenants that their right to be "secure in their persons, papers, homes, and effects" is subject to the whims of their landlords. But by limiting the application of our constitutional privacy right to state action only, the larger effect of today's decision is to cut the underpinnings from any future claim of invasion of privacy tort under the State Constitution. From today, unless state action is involved a tort claim between individuals for invasion of privacy may not be based on Art. II, § 10 of our State Constitution, but must instead be found in the common law. Tragically, it was not necessary for such a broad sweep of legal decision to set aside the exclusionary rule. In their zeal, the new majority rolled out a cannon to shoot a fly.

The majority opinion today results from a series of misconceptions that distort the reasoning of our previous cases. One such misconception is that we have held that the exclusionary rule is "rooted" in the Constitution. A second misconception leads the majority to conclude the right of privacy guaranteed by the State Constitution applies only to state action. A third misconception concerns the earlier dissents of the same justices who are now part of the new majority on the exclusionary rule.

It is a given that there is no textual support in our State Constitution for the exclusionary rule. Nowhere, and particularly not in Art. II, § 10, is there found the language "evidence obtained in violation of this section shall be excluded in the courts." But the same is true of the Federal Constitution. We search in vain for the words "right of privacy" in the express provisions of the Federal Constitution. The United States Supreme Court has dug that right out of the "penumbras" of the Bill of Rights. (At oral argument, the Attorney General of this State seemed unwilling to admit such penumbras.) In Griswold v. Connecticut (1965), 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510, it is said:

> "The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance (citing authority). Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment, in its prohibition against the quartering of soldiers 'in any house' in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fifth Amendment in its Self Incrimination Clause enables a citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in Constitution, of

13

certain rights, shall not be construed to deny or disparage others retained by the people.'

"The Fourth and Fifth Amendments were described in Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, as protection against all government invasions 'of the sanctity of a man's home and the privacies of life.' We recently referred in Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081, 1090, to the Fourth Amendment as creating a 'right to privacy, no less important than any other right carefully and particularly reserved to the people . . .'" 381 U.S. at 484-485.

This Court said in State v. Hyem (Mont. 1981), 630 P.2d 202, 208, 38 St.Rep. 891, 897, that the exclusionary rule "is a constitutional answer to unconstitutional activity." I insist on the integrity of that statement. That the exclusionary rule is constitutionally required, as distinguished from mandated, is supported by Justice Clark who said in Mapp v. Ohio (1961), 367 U.S. 643, 648, 81 S.Ct. 1684, 6 L.Ed.2d 1081, that the exclusionary rule is "that command which this Court has held to be clear, specific, and constitutionally required--even if judicially implied--deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to a 'form of words'. . ."

Contrary to the misconception of the majority, Hyem held not that the exclusionary rule was a constitutional right but a constitutional answer. It is a rule in accord with Art. II, § 16, Montana Constitution, that a speedy remedy be afforded "for every injury to person, property, or character."

The exclusionary rule is the only practicable "speedy remedy." Criminal prosecutions for deprivations of constitutional rights are limited to "willful" violations. Screws v. United States (1945), 325 U.S. 91, 65 S.Ct. 1031,

89 L.Ed. 1495. An injunction against violations cannot be obtained unless the party can establish he is likely to be injured by the practices again in the future. City of Los Angeles v. Lyons (1983), 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675. A civil action against a violator for damages is so obviously impracticable that it needs no discussion.

In view of the fruitlessness of other remedies, any lawyer worth his salt must admit the exclusionary rule is the only effective remedy that will protect against unconstitutional intrusions on privacy by busybodies or snitches.

We were treated by the State in oral argument in this case to a list of frightening possibilities under our exclusionary rule. What, we were asked, would the implications of the exclusionary rule be if the landlord in this case had found a body? The answer of course is simple: A body cannot be suppressed, any more than the body of a prisoner can be suppressed after an illegal arrest. But the exclusionary rule should be applied with might and main when any lesser evidence of criminal conduct is produced through unlawful intrusions into one's privacy, for all of the reasons usually expressed: the growth of technology in electronic eavesdropping; governments should not cooperate with unlawful intruders; no price can be placed on a constitutional right; the exclusionary rule should not depend on the fortuitous circumstance of who and of what quality was the intruder; judicial integrity is involved; and unlawful intrusions should not be encouraged.

Ah, but should the guilty go free? Emphatically yes, where the only evidence of guilt results from an invasion of the home or private precincts of the individual. Only the

cases where the intruder discovers criminal activity get into the courts. There must be tens of instances of unlawful intrusions into privacy which do not turn up criminal cases, for most of us obey the laws. The opportunity for courts to stress the heightened privacy right found in our State Constitution will only come in cases, like all other cases on constitutional rights, involving not very nice people. The right of all of us to our privacy weighs greater than the occasional and rare loss of conviction of a criminal. Essentially it preserves judicial integrity for the government not to act in concert with lawbreakers to convict other lawbreakers.

A second misconception of the majority is that the state constitutional right of individual privacy was intended by the framers to be a wall against state action only.

As laws usually reflect the will of the people on social, moral and economic issues, so too do constitutional provisions. The state framers in 1972 were not so far removed from pioneer days in Montana as to have forgotten our traditions of independence and privacy. Even the western usage of hospitality and welcome in remote places for the hungry wayfarer did not displace the duty of the wayfarer to respect the person, home and property of his host. The spirit of neutrality about our neighbor's business was captured by the long-forgotten poet who described the Montana he loved:

> With skies that reach from east to west
> And room to go and come
> I liked my fellow man the best
> When he was scattered some.

That spirit had found its way into the decisions of this Court before the 1972 constitutional convention. In State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47, this Court said:

". . . The state admits this, but contends that protection is afforded only against violations by law enforcement officers and not against violations by private citizens.

"We think not. The violation of the constitutional right to privacy and against compulsory self incrimination is as detrimental to the person to whom the protection is guaranteed in one case as in the other. To distinguish between classes of violators is tantamount to destruction of the right itself. This Court in 1952, in a civil case not involving state or federal governmental agents or activity, recognized this principle in the following passage from Welsh v. Roehm, 125 Mont. 517, 523, 524, 241 P.2d 816, 819:

"'Continuing the article announces:' The common law has always recognized a man's house as his castle, impregnable, often even to its own officers engaged in the execution of his commands.'"

"the 'right of privacy' is embraced within the absolute rights of personal security and personal liberty (citing authority.)

"'the basis of the right of privacy is 'the right to be let alone' and is 'a part of the right of liberty and pursuits of happiness.' (Citing authority.)" 157 Mont. at 270, 271, 485 P.2d at 50, 51.

Contrary to what is stated in the majority opinion, the constitutional framers certainly contemplated that Art. II, § 10 would be applicable to private as well as state action. In addition to the statement of the delegate quoted in the majority opinion (page 7, supra) that same Delegate Campbell continued:

". . . we feel that this, as a mandate to our government, would cause a complete reexamination and guarantee our individual citizens of Montana this very important right--the right to be let alone; and this has been called the most important right of them all. You all had placed on your desk the Montana Standards' editorial of February 3, 1972. I think it states it very well. 'Times change. That, in a nutshell, is why the Constitutional Convention delegates in Helena are working on a new and more modern governmental

17

charter for Montana. Today, with wire taps, electronic and bugging devices, photo surveillance equipment and computerized data banks, a person's privacy can be invaded without his knowledge and the information so gained can be misused in the most insidious ways. It isn't only a careless government that has this power to pry; political organizations, private organizations, private information gathering firms, and even an individual can now snoop more easily and more effectively than ever before. We certainly hope that such snooping is not as wide spread as some person would have us believe, but with technology easily available and becoming more refined all the time, prudent safeguards against the misuse of such technology are needed. Some may urge and argue that this is a legislative, not a constitutional issue. We think the right of privacy is like a number of other inalienable rights; a carefully worded constitutional article reaffirming this right is desirable. Wade Dahood of Anaconda, chairman of the Bill of Rights Committee, hit the nail on the head when he said: 'As government functions and controls expand, it is necessary to expand the rights of the individual.' The right to privacy deserves specific protection. Mr. Chairman, I would recommend adoption of this section." Montana Constitutional Convention, Verbatim Transcript, Volume 5, at 1681.

Beyond cavil, in the light of the holding in State v. Brecht, supra, which we must assume the framers knew about, and the direct statement of the delegate proposing Art. II, § 10 for constitutional adoption, a clear intention existed to guarantee individual privacy in Montana from and after 1972 against both state and private action.

State v. Solis (1984), ___ Mont. ___, 693 P.2d 519 is not authority from this Court regarding the effect of state action under the Privacy Clause. The case involved warrantless videotaping by police officers in a "sting" operation. In excluding the videotapes, two Justices based their opinion on a right of privacy in a "sting" operation. Three Justices concurred in the result only because they saw the case as an illegal search without a warrant based on federal law. They did not discuss privacy. Two other Justices dissented and would have held

18

the search valid. The Justices who saw a privacy issue in the case under the Privacy Clause relied on our earlier holdings in Hyem and Van Haele, which are today overruled.

Perhaps the most telling argument against the State-action-only interpretation of our privacy clause is that the framers gave us a toothless clause if all they intended to cover was state action. Interpreted as a majority today interprets our state privacy clause, it is but the functional equivalent of what is minimally guaranteed to us in the Federal Constitution, but we are entitled to the federal minimums of privacy with or without the Montana Constitution. The Fourteenth Amendment of the U.S. Constitution has, since Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, guaranteed that states would protect the privacy rights of individuals penumbrally contained in the U.S. Constitution. Those privacy rights existed and still exist before and since the adoption by Montana of Art. II, § 10, and would exist without the State Constitution.

I maintain that the Montana constitutional framers in 1972 wanted to do more for Montanans in the field of privacy. They adopted Art. II, § 10 to give Montanans a heightened right of privacy, beyond the privacy rights found in the U.S. Constitution. That aspiration for a heightened right meant that our State Constitution would afford privacy greater than the minimum guarantees of the Federal Constitution.

There is no force to the majority argument that the Privacy Clause should be applied only to state action because hitherto Montana stands alone in applying it to private action. Montana's constitutional Privacy Clause is unique. No other state has a State Constitution provision exactly

19

like it. The closest is that of Alaska in Art. I, § 22, 1972 Alaska Constitution, which provides:

"The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section."

In Allred v. Alaska (Alaska 1976), 55 P.2d 411, where one of the questions presented was whether statements made by a defendant to a counselor were protected by Alaska's constitutional provision on privacy, the Alaska Supreme Court seems to assume without discussion that it would take state action to trigger the constitutional privacy guarantee.

In California, in November 1972, the voters amended Art. I, § 1 of their State Constitution to include among the various "inalienable" rights of all people the right of "privacy." Curiously, as far as I am aware, no California case has specifically decided whether the right of privacy in the California Code applies to private action. However, in White v. Davis (1975), 13 Cal.3d 757, 120 Cal.Rptr. 94, 533 P.2d 222, the California Supreme Court identified the principle "mischiefs" at which the privacy right was directed, including "the overbroad collection and retention of unnecessary personal information by government and business interests." To that extent at least, California presumably would recognize that its privacy right precludes business interests from intruding on individual privacy.

Five states, Hawaii, Illinois, South Carolina, Louisiana and Florida as of 1968 included the right of privacy in some form as a part of the traditional constitutional prohibition against unreasonable searches and seizures. See Toward A Right of Privacy, Gerald B. Cope, Jr., 5 Fl.S.Univ.L.Rev. (1977), 633, 710-734. Our framers declined that approach.

20

It is noteworthy that in our 1972 Constitutional Convention, the first draft of the search and seizure provision, Art. II, § 11, included language that "the people shall be secure . . . from unreasonable searches and seizures and _invasions_ _of_ _privacy_ . . ." The delegates recognized that the modifier "unreasonable" in § 11 weakened the right of privacy they had established in § 10. Montana Constitutional Convention, Verbatim Transcript, Vol. 5 at 1688. The convention therefore deleted reference to privacy from § 11.

Two other states have a constitutional provision for privacy, Washington and Arizona. Arizona treats its constitutional provision as the functional equivalent of the Fourth Amendment, Arizona v. Murphy (1977), 117 Ariz. 57, 570 P.2d 1070. Washington, however, is approaching what had been Montana's position on the effect of its constitutional privacy provision. Art. I, § 7 of Washington's Constitution provides that "no persons shall be disturbed in his private affairs or his home invaded, without authority of law." In State v. Williams (1984), 102 Wash.2d 773, 689 P.2d 1065, 1070, the Washington Court said:

> "This provision differs from the federal constitution and provides heightened protection to our citizens' privacy rights (citing authority). Where, as here, no probable cause exists to arrest the suspect, we believe that the language of Const. Art. I, § 7 forbids police seizures of this nature."

Although State v. Williams addressed police action, and not private action, Washington aligned itself with Montana in determining that the right of privacy afforded by its state constitution is greater than the federal minimums.

The majority has referred to the Wyoming decision of State v. Heiner (Wyo. 1984), 683 P.2d 629, in which Wyoming

21

identified us as the single jurisdiction that applied the right of privacy to private as well as state action. Wisely, the majority decided not to rely on Wyoming as authority in reaching its decision today. The myopic comments of the Wyoming Supreme Court respecting State v. Hyem (Mont. 1981), 630 P.2d 202, 38 St.Rep. 891, result from its conclusion that our history of the exclusionary rule vis-a-vis private action is a "somewhat tortured history." Not tortured, but straight-forward has been our line of decisions. From State v. Brecht, supra, through State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442; State v. Sawyer (1977), 174 Mont. 512, 571 P.2d 1131; State v. Helfrich (1979), 183 Mont. 484, 600 P.2d 816; State v. Hyem, supra; State v. Sayers (Mont. 1982), 648 P.2d 291, 39 St.Rep. 1309; and State v. Van Haele (Mont. 1982), 649 P.2d 1311, the course of our decisions has been straight as an arrow: Our constitutional right of privacy applied to private action. There have been dissenters, but we have not had torture.

The importance of the privacy provision to the framers can be assumed from its position in Art. II, relating to the declaration of individual rights. The privacy section preceded the provision against unreasonable search and seizures (§ 11), the right of suffrage (§ 13), the right to justice in the courts (§ 16), the right to due process (§ 17), the privilege of habeas corpus (§ 19), and the right to bail (§ 21). It preceded the right of an accused to meet his witnesses face-to-face (§ 24), the right against self-incrimination and double jeopardy (§ 25) and the right to trial by jury (§ 26). By placing the right of individual privacy before all of those other essential rights, the framers, I submit, meant to evince their intention to give a

22

heightened right to privacy beyond the minimum rights of privacy penumbrally found in the Federal Constitution. It was within the power of the state constitutional framers so to do.

The framers in 1972 had a beautiful conception: They felt the force of our tradition that each person ought to mind his own business; they saw the home as a place of refuge, peace and security. They provided that a wall of law should be erected against all onslaught except when the compelling interest of the State demanded otherwise. Private persons do not act for the State. Intruders into privacy may be nothing more than nosy neighbors, busybodies, or snitches. The framers extended the right of privacy especially against these.

Gone is that beautiful conception. Left only are the minimum protections of the Federal Constitution, which nowhere expressly guarantees individual privacy. Federally, our privacy rights are no more than the shifting courts are inclined to allow. Under our State Constitution, our individual privacy rights are expressly stated to be paramount. The framers unfortunately did not foresee that this Court would dilute their positive declaration in Art. II, § 10, by reading into its clear language some darkling exception. This Court has stamped "approved" on the nettlesome intruders, the nosy ones, the busy ones, the snitches. It has said welcome to the "Big Spy Country."

The third misconception of the majority is embedded in their irresolution about the nature and extent of our state Privacy Clause, as demonstrated by a comparison of the statements of the majority and their earlier dissents.

23

In the concluding paragraphs of the majority opinion, we are given a moment's glimpse of the monster now penned up in the basement. It may be turned loose again if the State proposes to use evidence obtained in criminal activity.

It defies imagination how a criminal exception can be read into the clear language of Art. I, § 10. The glaring internal inconsistency of the majority is the apparent concession that the Privacy Clause applies to private action if the private actors are criminals.

If the majority does indeed intend that criminal activity shall be the watershed in the future in determining rights under the privacy clause, it is a further sticking inconsistency that the majority glides by the criminal activity of Hultren in this case. The landlord stands before us as a trespasser. He is indeed guilty of criminal trespass under § 45-6-203, MCA. The offense of criminal trespass of property is committed if a party knowingly enters or remains unlawfully in an occupied structure. Section 45-6-203. A person enters or remains unlawfully in an occupied structure when he is not licensed, invited, or otherwise privileged to do so. Section 45-6-201, MCA. In State v. Dess (1979), 184 Mont. 116, 602 P.2d 142, we upheld the conviction of Dess for misdemeanor criminal trespass on his mere unlawful presence in an occupied structure. There is no way here to distinguish the criminal activity of Dess from that of Hultgren, except the possible reluctance of the county attorney to press the charge against Hultgren. The majority offer no explanation why we must wait for another day for the determination of the effect of criminal activity on the Privacy Clause. This case presents criminal activity to the Court.

24

For a better understanding of the irresolution of some members of the majority, the reader is invited to examine their dissents in State v. Hyem, supra; State v. Van Haele, supra; and their statements in this case.

In Hyem, the court applied the exclusionary rule to exclude evidence obtained by two parties who entered a private home on a ruse in order to discover evidence of stolen property. The majority held that the Privacy Clause was violated, and this required the exclusion of the evidence. Justice Morrison dissented, contending without reservation that constitutions are intended to establish rights only between private persons and their government, and that the exclusionary rule should not be applied where individual privacy was violated by private parties. Justices Weber and Harrison concurred in Justice Morrison's dissent. In Hyem, Justice Daly weighed in with a stinging special concurrence, attacking the dissent for "overzealous statements" and pointing out language from State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442, to effect that constitutions must be capable of adaptation to a changing world.

In Van Haele, the court ordered the exclusion of evidence produced when a private party removed the hinges from the padlocked door of a rented storage unit and entered the defendant's unit to obtain incriminating evidence. In that case, Justice Morrison concurred, asserting again that he found no support in the privacy clause to proscribe private action but that he would "modify his position from that articulated in Hyem" to apply the exclusionary rule as a rule of court procedure where "a private individual violates the penal statutes of this state." 649 P.2d at 1319.

25

Justice Weber concurred with Justice Morrison. In effect, Justice Morrison's special concurrence condoned the use of the exclusionary rule as a rule of court procedure to be applied to _private_ criminal action which violated the privacy clause.

Justice Harrison dissented in _Van Haele_ saying that the exclusionary rule should not be used where "it is discovered by officers or _private persons_ in a course of actions that are taken in good faith and in the reasonable, though mistaken belief that they are authorized." 649 P.2d at 1319. Thus, Justice Harrison in effect would remove the exclusionary rule from not only the privacy clause but also the Fourth and Fifth Amendments of the Federal Constitution.

In light of the present decision, the case at bar, where is the court heading now if the present majority continues to prevail in cases involving private invasions of individual privacy which develop incriminating evidence? In _Hyem_, the justices would not exclude evidence developed by any private action. In _Van Haele_, these justices would exclude evidence if it were developed through a violation of the penal statutes. In this case, State v. Long, a violation of the penal statutes occurred, but the question of the application of the exclusionary rule under criminal activity is postponed to another day. Apparently criminal activity does not count unless the perpetrator is actually criminally charged in the courts.

A final evidence of irresolution is that today the majority has overruled _Van Haele_, a decision in which two of the majority justices concurred one and one-half years ago.

I would adhere to our earlier cases and uphold the decision of the District Court to exclude the evidence.

26

John C. Sheehy

Justice

27

Justice William E. Hunt, Sr., dissenting:

I dissent and concur in the opinion of Mr. Justice Sheehy.

The District Court should be affirmed. Montana has rightfully placed privacy paramount to any illegal public or private intrusion. The constitutional delegates knew Montana when they wrote:

> "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II, § 10.

This has been the law and should remain the law without exception or qualification.

It is no favor to judicial integrity to use an incident of an illegal intrusion as a substitute for due process. The majority of this Court now allows the trespasser and the snoop to do work properly assigned to lawfully constituted law enforcement. We should leave law enforcement to those legally and rightfully entrusted with that task. It is not an injustice to society to apply the exclusionary rule to private searches. If a private search is a result of illegal or improper conduct, including trespass, all evidence obtained therefrom should be excluded. Law enforcement should be left to law enforcement officers who are not only trained to apprehend the wrongdoer but, just as importantly, to respect the rights of all Montana citizens including what was, before the majority opinion, the constitutional right to privacy.

_____
Justice

28

Mr. Justice Frank B. Morrison, Jr. concurring:

I am taking the rather unusual step of replying to the dissent of Justice Sheehy in this case. The majority opinion, although authored by this writer, speaks for the majority of the Court. The views herein expressed are my own.

The dissent is an eloquent, if legally unsound, defense of privacy. Its several weaknesses may be readily discernable but I wish to formally join the issue.

The dissent states:

> "I maintain that the Montana constitutional framers in 1972 wanted to do more for Montanans in the field of privacy. They adopted Art. II, § 10 to give Montanans a <u>heightened</u> right of privacy, beyond the privacy rights found in the U.S. Constitution. That aspiration for a heightened right meant that our state constitution would afford privacy greater than the minimum guarantees of the federal constitution."

The dissent then goes on to define the majority position:

> "Gone is that beautiful conception. Left only are the minimum protections of the federal constitution, which nowhere expressly guarantees individual privacy."

Our people should not be mislead by this careless characterization of Montana's privacy right. The framers of our constitution intended that privacy be specifically recognized and the right as it exists under Montana law is unquestionably paramount to the privacy right implied in the federal constitution.

In State v. Solis (1984), 41 St.Rep. 2493, _____ P.2d _____, this issue was directly confronted. The United States Supreme Court, in United States v. Caceres (1979), 440 U.S. 741, 99 S.Ct. 1465, 59 L.E.2d 733, had said:

> "Neither the constitution nor any act of congress requires that official approval be secured before conversations are overheard or recorded by

29

government agents with the consent of one of the conversants."

We refused to follow the United States Supreme Court in Solis. We specifically recognized that the right of privacy in Montana is greater than under the United States Constitution and that we need not, under these circumstances, follow the lead of the United States Supreme Court. The majority of this Court held that electronic eavesdropping, by video taped recording, violated the right of privacy and was subject to exclusion. Thus, this Court firmly recognized the superior right of privacy in Montana.

The dissent again goes awry, in attempting to identify an inconsistency between the dissenter's view as expressed in State v. Hyem, supra and State v. Van Haele, supra. The dissent states:

> "It defies imagination how a criminal exception can be read into the clear language of the Art. I, § 10. The glaring internal inconsistency of the majority is the apparent concession that the privacy clause applies to private action if the private actors are criminals."

This position of the dissent underscores the rationale that resulted in State v. Brecht, supra, and its progeny. The majority opinion does not imply nor does the dissent in Van Haele indicate that there is a criminal exception to the privacy clause of the Montana Constitution. The dissent continues to confuse the privacy clause with the exclusionary rule.

Criminal conduct, unless done with state complicity, does not violate privacy. However, the fruits of felonious action may be excluded as evidence, not because there is a constitutional violation, but because the trial court feels its exclusion necessary to preserve the integrity of the judicial system. "Other crimes evidence" is excluded because the courts have decided that its probative weight is usually

30

less than its potential prejudicial effect. Hearsay evidence is normally excluded because, without the opportunity for cross-examination, its credibility cannot be sufficiently tested. The court excludes evidence for a variety of reasons including preservation of court integrity. On the latter basis a court may feel that a search is so abhorrent that the evidence should be excluded rather than in any way legitimized. This rule has nothing to do with the constitution. The rule can be reworked, shaped, and changed as other rules of evidence.

The dissent's real plea emanates from a public policy concern. The public policy issue of whether the privacy clause should cover private action has not been treated in the majority opinion. Rather, we have sought to determine whether there was a clear intention expressed by the framers to depart from traditional constitutional concepts. We found there was not. Therefore, we have limited the application of the privacy clause to state action.

The battle cry sounded in the dissent may, at first blush, have an alluring ring to liberals and civil libertarians. There is, however, a real danger in extending privacy rights to the interaction of individuals.

Privacy competes with other rights declared by our state constitution to be fundamental. My right to be left alone competes with my neighbor's right for self-expression. The danger of holding that my right to privacy is constitutionally protected from invasion by my neighbor but my neighbor's right of free speech is not protected from my invasion, is apparent.

The rights and responsibilities that we as people have, one to the other, should be competed for in the legislative

31

forum.    This better reflects the dynamic nature of our society and gives vibrance to the political process.

Justice